# No. 25-30078

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF – APPELLEE

V.

ADRIAN DEXTER TALBOT, MEDICAL DOCTOR
DEFENDANT – APPELLANT

## On Appeal from
United States District Court for the Eastern District of Louisiana
2:21-CR-111-1

## BRIEF OF APPELLANT ADRIAN TALBOT, M.D.

SUBMITTED BY:
Ronald William Chapman
Chapman Law Group
1441 W. Long Lake Road
Troy, MI  48098

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| United States of America | Kevin Boitmann of U.S. Attorney's Office New Orleans, LA |
| United States of America | Megan Roberts of U.S. Attorney's Office New Orleans, LA |
| United States of America | Jeremy Raymond Sanders of U.S. Attorney's Office New Orleans, LA |
| United States of America | Diane Hollenshead Copes of U.S. Attorney's Office New Orleans, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| Adrian Dexter Talbot, M.D. | Ronald Chapman of Chapman Law Group Troy, MI |

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.
*Counsel for Defendant – Appellant*
*Adrian Dexter Talbot, M.D.*

ii

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant-Appellant, Adrian Talbot, M.D. respectfully requests oral argument. This appeal raises multiple legal and factual issues as Dr. Talbot was not provided with a fair trial. Oral discussion of the facts and the applicable precedent will benefit the Court.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS.................................................................................... iv

TABLE OF AUTHORITIES ............................................................................ vii

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE.............................................................................3

     A.  Dr. Talbot's Medical Background and Practice....................................3

     B.  DEA Compliance Interactions Before the Charged Period .................3

     C.  The Prasad Contract and the Defense Proffer Concerning Diagnosis ..4

     D.  Charges and the Government's Theory..................................................5

     E.  Competency Proceedings and Related Determinations ........................5

     F.  Rule 404(b) and Other Evidentiary Rulings.........................................6

     G.  Proof at Trial .......................................................................................7

     H.  Verdict and Post-Trial Motions............................................................8

SUMMARY OF THE ARGUMENT ..................................................................10

ARGUMENT ....................................................................................................12

    I.     THE DISTRICT COURT ERRED IN DECLARING DR. TALBOT
          COMPETENT TO STAND TRIAL. ......................................................12

A. The Government's Malingering Methodology Departed From Accepted PVT Standards; A *Daubert* Inquiry was Required and Never Performed. ..................................................................13

B. The July 9, 2024 Order Reframed the Defense's Methodological Challenge as "No New Worsening," Leaving the Rule 702/*Daubert* Problem Unaddressed. ...................................................15

C. The Court Also Discounted Powerful, Objective Counter-Evidence, Heightening the Need for Reliable Methodology. ..............................16

D. Expert-Selection Irregularities Amplified the Need for Strict Gatekeeping. .......................................................................17

E. Prejudice and Remedy. .....................................................................17

II.   THE DISTRICT COURT ERRED IN DENYING A COMPETENCY HEARING AND PROCEEDING WITHOUT ADEQUATE PROCEDURAL SAFEGUARDS UNDER 18 U.S.C. § 4241 AND DUE PROCESS. ...................................................................................18

III.   THE COURT ABUSED ITS DISCRETION BY ADMITTING VA "404(B)" EVIDENCE AND THEN RESTRICTING THE DEFENSE'S ABILITY TO REBUT IT—INVITING PROPENSITY REASONING WHILE DEPRIVING THE JURY OF CONTEXT AND CONFRONTATION. .............................................................................21

IV.   THE EVIDENCE IS INSUFFICIENT TO SUSTAIN DR. TALBOT'S CONVICTIONS. .........................................................................25

V.   THE COURT IMPROPERLY INSTRUCTED THE JURY ...................28

VI.   MAINTAINING A DRUG INVOLVED PREMISES (§ 856) MUST BE VACATED BECAUSE THE STATUTORY TEXT DOES NOT REACH A PHYSICIAN'S PRESCRIBING ("DISPENSING") AND, IN ANY EVENT, THE GOVERNMENT FAILED TO PROVE THE REQUIRED "PURPOSE." ...............................................................................32

VII.  THE PROSECUTION'S REBUTTAL CONTAINED IMPROPER, PREJUDICIAL REMARKS—INCLUDING A PATIENT DEATH INSINUATION—REQUIRING VACATUR. ...........................................36

A. Patient death insinuation in rebuttal violated the court's limit and inflamed the jury....................................................................37

CONCLUSION ...........................................................................................40

CERTIFICATE OF SERVICE ...................................................................41

CERTIFICATE OF COMPLIANCE ...........................................................42

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................36

*Chapman v. California*, 386 U.S. 18 (1967).................................................. 30, 31

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................... 12, 13, 14, 15, 17, 18

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986).....................................................24

*Dusky v. United States*, 362 U.S. 402 (1960) (per curiam) ........................ 12, 18, 21

*Drope v. Missouri*, 420 U.S. 162 (1975) ............................................ 12, 16, 19, 20

*Jackson v. Virginia*, 443 U.S. 307 (1979).............................................................26

*Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178 (5th Cir. 1996)....17

*Kotteakos v. United States*, 328 U.S. 750 (1946) ........................................... 25, 39

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ......................... 12, 14, 16, 17

*Neder v. United States*, 527 U.S. 1 (1999)..................................................... 29, 31, 32

*Old Chief v. United States*, 519 U.S. 172 (1997).................................................25

*Pate v. Robinson*, 383 U.S. 375 (1966) ......................................................... 18, 21

*United States v. Barnes*, 803 F.3d 209 (5th Cir. 2015)..................................... 34, 35

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978)…………22, 24, 25, 27, 31

*United States v. Diaz-Carreon*, 915 F.2d 951 (5th Cir. 1990) ......................... 38, 39

*United States v. Gallardo-Trapero*, 185 F.3d 307 (5th Cir. 1999)................... 36, 39

*United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008)........................ 36, 37, 38, 39

*United States v. Granderson*, 511 U.S. 39 (1994) ..............................................34

*United States v. Hall*, 20 F.3d 1084 (10th Cir. 1994)..........................................36

*United States v. Kinchen*, 729 F.3d 466 (5th Cir. 2013)......................................24

*United States v. Lamartiniere*, 100 F.4th 625 (5th Cir. 2024)...............................28

*United States v. Makris*, 535 F.2d 899 (5th Cir. 1976)............................... 18, 20, 21

*United States v. Morgan*, 117 F.3d 849 (5th Cir. 1997) ......................................27

*United States v. Soto-Silva*, 129 F.3d 340 (5th Cir. 1997)....................................27

*United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012)........................................35

*United States v. Young*, 470 U.S. 1 (1985) ................................................ 36, 38, 39

*Ruan v. United States*, 597 U.S. 450 (2022).......................... 10, 24, 25, 26, 28, 29, 30, 31, 35, 39

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127 (5th Cir. 2018) ...............33

**Statutes, Rules, and Regulations**

18 U.S.C. § 1349 ....................................................................................................5

18 U.S.C. § 4241 ........................................................ 2, 10, 12, 15, 18, 19, 20, 21

18 U.S.C. § 846………………………………………………………………….5

21 U.S.C. § 802 ................................................................................................ 32, 33

21 U.S.C. § 841. ............................................. 25, 28, 30, 31, 33, 34, 35, 36, 37

21 U.S.C. § 841(a)(1)...........................................................................................5, 33

21 U.S.C. § 856.......................................................... 2, 5, 10, 11, 33, 34, 35, 36

21 U.S.C. § 856(a)(1)............................................................................. 5, 32, 36

28 U.S.C. § 1291………………………………………………………………...…1

Fed. R. Crim. P. 12(b).........................................................................................36

Fed. R. Evid. 403……………………………………………………………….7, 23

Fed. R. Evid. 404(b)……………………………………………..6, 7, 8, 10, 21, 22, 28

Fed. R. Evid. 702 ................................................................. 12, 13,14,15, 17, 18

## **JURISDICTIONAL STATEMENT**

Jurisdiction of this Court is invoked 28 U.S.C. § 1291, as an appeal from a final judgment of conviction and sentence in the United States District Court for the Eastern District of Louisiana. Notice of appeal was timely filed in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## **STATEMENT OF THE ISSUES**

ISSUE ONE: Whether the district court erred in declaring Dr. Talbot competent to stand trial.

ISSUE TWO: Whether the district court erred in denying a competency hearing and proceeding without adequate procedural safeguards under 18 U.S.C. § 4241 and due process.

ISSUE THREE: Whether the district court erred in denying a competency hearing and proceeding without adequate procedural safeguards under 18 U.S.C. § 4241 and due process.

ISSUE FOUR: Whether the evidence is insufficient to sustain Dr. Talbot's convictions.

ISSUE FIVE: Whether the court improperly instructed the jury.

ISSUE SIX: Whether maintaining a drug involved premises under 21 U.S.C. § 856 must be vacated because the statutory text does not reach a physician's prescribing ("dispensing") and, whether the government failed to prove the required "purpose."

ISSUE SEVEN: Whether the prosecution's rebuttal contained improper, prejudicial remarks—including a patient death insinuation—requiring vacatur.

## STATEMENT OF THE CASE

### A. Dr. Talbot's Medical Background and Practice

Adrian Talbot, M.D., is a physician who owned and operated Medex Clinical Consultants, PLLC, a professional practice he established in 2010 in Slidell, Louisiana, providing care to patients with pain and addiction-related disorders. (ROA.1500-01; ROA.34-54). Dr. Talbot began his medical career as a U.S. Navy corpsman and served in the Navy from 1984 to 2005 before continuing in civilian practice. (ROA.1595-96; ROA.1500-1502).

By 2014–2015, Dr. Talbot exhibited signs consistent with cognitive decline; by mid-2016, he had a working diagnosis of a neurocognitive disorder, and his responsibilities were adjusted as he sought additional testing and support. (ROA.1501 (citing PSR ¶ 128)). In early 2015, he accepted employment at the Alexandria VA Medical Center while Medex continued seeing patients with staff support. (ROA.1501-1501). In November 2016, Anil Prasad, M.D. entered into a contract to assume clinical responsibilities at Medex. (ROA.1502, citing PSR ¶ 59).

### B. DEA Compliance Interactions Before the Charged Period

Dr. Talbot practiced in a heavily regulated space and interacted with Drug Enforcement Administration ("DEA") diversion personnel years before the conduct alleged in the Indictment. The record reflects a routine DEA cyclic inspection at Medex (then "MedEx Ambulatory Care Center") on March 10, 2006, documenting

3

his registration, that he did not store or dispense controlled substances on site, and that he prescribed buprenorphine primarily for pain (not maintenance/detox), with awareness of patient limits imposed under the Drug Addiction Treatment Act ("DATA"). (ROA.1325-28; ROA.1353; ROA.1358-1359).

Days before trial, the Government produced a large set of State Board records that included DEA Reports of Investigation from 2006, 2010, and 2012. The defense moved under Rule 17(c) for DEA subpoenas to clarify the scope of historical oversight, including any subsequent inspections and outcomes; the court denied the request after the Government maintained DEA was not part of the "prosecution team" and represented there was no active DEA investigation. (ROA.1206-07; ROA. 1208-13; ROA.1325-29).

**C. The Prasad Contract and the Defense Proffer Concerning Diagnosis**

After contracting with Medex in late 2016, Dr. Prasad later gave statements about Dr. Talbot's functional capacity that conflicted with earlier clinical impressions and letters, producing tension the defense sought to explore at trial. To preserve the issue, the defense proffered the dementia diagnosis evidence (including the 2016 timeline and Prasad's treatment notes) outside the jury's presence when the court limited the scope of mental-health evidence in the defense case-in-chief. (ROA.1337-39). While the evidence was placed on the record, the trial judge left the bench and did not hear the testimony of Dr. Prasad.

### D. **Charges and the Government's Theory**

On August 26, 2021, a grand jury returned a seven-count indictment charging: Count 1, Conspiracy to Unlawfully Distribute and Dispense Controlled Substances, 21 U.S.C. § 846; Counts 2–5, Unlawful Distribution and Dispensing of a Controlled Substance, 21 U.S.C. § 841(a)(1); Count 6, Maintaining a Drug-Involved Premises, 21 U.S.C. § 856(a)(1); and Count 7, Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349. (ROA.34-54; ROA.1631-37). The Government's theory was that between February 2015 and July 2018, Dr. Talbot issued controlled-substance prescriptions outside the usual course and without a legitimate medical purpose, maintained Medex as a drug-involved premises, and joined a scheme to defraud health-care programs. (ROA.1034).

### E. **Competency Proceedings and Related Determinations**

Dr. Talbot's service at Marine Corps Base Camp Lejeune left him exposed to contaminated drinking water; federal law and the U.S. Department of Veterans Affairs ("VA") guidance recognize compensable harms from that exposure. The defense competency filings documented 100% VA service-connected disability for traumatic brain injury and major neurocognitive disorder, and Louisiana state-court interdiction/guardianship orders concluding he could not manage his affairs. (ROA.1167-68, 1171).

The magistrate judge held a two-day evidentiary hearing in March 2022 and found Dr. Talbot competent, crediting government experts and describing aspects of his testing as malingering. (ROA.1187-88). Given dementia's progressive nature, the district court set a continuation hearing for November 8–9, 2023, received additional expert and treating-physician testimony, and again found Dr. Talbot competent. (ROA.1188-89).

The court re-raised competency at the final pretrial to avoid eleventh-hour disruption. The defense maintained that Dr. Talbot was not competent to stand trial and the defense submitted a July 2024 telehealth report from Dr. Chakrapani Ranganathan in support of his continued lack of competence. The court denied a further competency hearing, explaining that the new report largely mirrored prior descriptions and lacked new testing [ignoring the evaluation of a board-certified neurologist] or review of the Government's prior expert reports. (ROA.1189-92). The defense filings emphasized the VA's disability adjudication, the state interdiction, and treating neurologist Dr. James Nelson's opinions as objective indicators of present incompetence. (ROA.1167-74). The Court ordered that trial shall proceed.

## F.  Rule 404(b) and Other Evidentiary Rulings

Before trial, the defense moved to exclude proposed "other-acts" evidence concerning Dr. Talbot's Alexandria VA employment and related VA "fact-finding."

(ROA.893-99). The court denied the motion and allowed limited VA evidence under Fed. R. Evid. 404(b) for non-propensity purposes (intent, knowledge, absence of mistake), with a limiting instruction. (ROA.1145-46).

Separately, the court addressed patient-death references, warning of Rule 403 concerns and the proper temporal scope; the court directed that any such references be closely policed and, at a pretrial hearing, required the Government to approach the bench before using that theme. (ROA.1034-36; ROA.891-92).

Consistent with these rulings, the Final Jury Charge instructed the jury that breach of regulations or standards, standing alone, is not a crime and may be considered only for issues like intent and knowledge; the charge also delivered an "other acts" limiting instruction tracking Rule 404(b). (ROA.1251-73).

### G. Proof at Trial

At trial, the Government's proof centered on clinic prescriptions during February 2015–July 2018, documentation practices, and office workflows to argue that certain prescriptions were outside the usual course and without a legitimate medical purpose. (ROA.1034-36). It also presented evidence about how Medex functioned while Dr. Talbot split time between the Alexzandria VA and Medex, including staffing arrangements and Dr. Prasad's role. (ROA.1145-49).

The defense cross-examination and proffers emphasized the complexity of addiction/pain patients, evolving compliance expectations, and Dr. Talbot's

regulatory engagement, including the 2006 DEA cyclic inspection and subsequent interactions reflected in the late-produced materials—evidence the defense sought to expand via subpoena. (ROA.1354-60; ROA. 1206-07, 1208-13).

Regarding the VA, the defense highlighted the internal VA "fact-finding" results the Government itself put into play, which showed that in a sample of 2015 encounters a substantial portion had documentation supporting the care provided; the defense position was that such administrative findings do not substitute for the "legitimate medical purpose" standard in a criminal case. (ROA.895-99, 1145-49). In keeping with its pretrial warnings, the court used sidebars and instructions to cabin patient-death references and prevent unfair prejudice or time-frame creep beyond the charged period. (ROA.1034-1036; ROA.921-23).

## H. Verdict and Post-Trial Motions

On July 22, 2024, the jury returned guilty verdicts on all seven counts. (ROA.1631) (reflecting convictions on Counts 1–7). Dr. Talbot moved for a judgment of acquittal or, alternatively, a new trial, arguing (among other things) evidentiary error (VA/404(b) and patient-death themes), insufficiency on knowledge and intent, and cumulative prejudice; the Government opposed. (ROA.1311-12, 1313-52; ROA.1416-65). The district court denied relief by written order. (ROA.1473-99).

The district court imposed 87 months' imprisonment on each count, all concurrent, a $700 special assessment, and deferred restitution determination. (ROA.1635-37). The Judgment was entered on February 5, 2025, following the July 2024 verdict. (ROI.1631-37). Dr. Talbot filed a timely notice of appeal. (ROA.1639).

## SUMMARY OF THE ARGUMENT

1.      The district court erred in declaring Dr. Talbot competent to stand trial The court relied on unreliable malingering testimony without conducting a Rule 702 hearing to assess the Government's methodology. The court further refused to convene a competency hearing despite objective evidence of Dr. Talbot's progressive neurocognitive disorder, VA adjudications of total disability, and state interdiction orders, which is contradictive of 18 U.S.C. § 4241 and due process.

2.      The court abused its discretion in admitting VA "other acts" evidence under Rule 404(b) while at the same time restricting defense's ability to confront and rebut that same evidence, creating impermissible propensity reasoning and depriving the jury of context.

3.      The evidence is insufficient to sustain Dr. Talbot's conviction. After *Ruan v. United States*, the Government was required to prove that Dr. Talbot knew his prescribing was unauthorized. Instead, the prosecution relied on administrative disputes, after the fact expert disagreement, and workflow testimony, none of which established Dr. Talbot's subjective intent. The evidence also failed to establish that Medex was maintained for an illicit "distribution" purpose under 21 U.S.C. § 856 or that Dr. Talbot conspired to commit health care fraud.

4.      The jury instructions did not comply with *Ruan*. The charge allowed conviction based on an objective deviation from medical standards, rather than

10

requiring proof that Dr. Talbot subjectively knew his prescribing was unauthorized. Allowing the civil standards heightened the error, which resulted in relieving the Government of its burden of proof.

5.    The conviction under Count 6 must be vacated because it falls outside of 21 U.S.C. § §856, which criminalizes maintaining a place for the purpose of manufacturing, distributing, or using any controlled substance," and says nothing about "dispensing."

6.    The prosecutions rebuttal included improper and prejudicial remarks, including insinuations about a patient's death that violated the court's pretrial order, attacks on defense counsel and, extra-record assertions. These remarks by the prosecution inflamed the jury.

11

**ARGUMENT**

## I.    THE DISTRICT COURT ERRED IN DECLARING DR. TALBOT COMPETENT TO STAND TRIAL.

The court's reliance on "malingering" evidence—without reliably vetting the Government's methodology—and its refusal to strike that testimony violated Fed. R. Evid. 702, *Daubert*, and due process. A criminal trial may proceed only if the accused "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and a rational as well as factual understanding of the proceedings." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). Congress codified that protection by directing courts to hold a competency hearing whenever there is "reasonable cause" to believe a defendant "may presently be" incompetent. 18 U.S.C. § 4241; *Drope v. Missouri*, 420 U.S. 162, 180–81 (1975). In parallel, Rule 702 requires the court to ensure expert opinions are the product of reliable principles and methods reliably applied; *Daubert* and *Kumho Tire* make that gatekeeping obligation non-optional for technical and clinical opinions. Rule 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–95 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–53 (1999).

Here, the competency rulings repeatedly turned on a finding of "malingering" and the court's acceptance of the Government's neuropsychology testimony to that effect. Yet the record shows two independent errors: (1) the Government's performance-validity testing ("PVT") methodology departed from accepted criteria

12

(inflated cutoffs; selective reliance on embedded indices while discounting passed stand-alone measures); and (2) when the defense specifically challenged those methodological departures and supported the challenge with literature-based critique, the court declined to conduct the necessary Rule 702 and *Daubert* analysis, instead framing the issue as a lack of "discernible worsening" since an earlier hearing. (ROA.189–90).

A. **The Government's Malingering Methodology Departed From Accepted PVT Standards; A *Daubert* Inquiry was Required and Never Performed.**

After an initial hearing on March 21-22, 2022, at which the magistrate judge deemed Dr. Talbot a malingerer, the district court adopted that conclusion, then held a continuation hearing on November 8–9, 2023. (ROA.1188). At that hearing, the Government relied on neuropsychological opinions labeling Dr. Talbot non-credible, while the defense presented treating and clinical neuropsychology testimony consistent with progressive neurocognitive disorder. *Id.* The "malingering" label continued to do the load-bearing work in the court's analysis.

On the eve of trial, the defense squarely challenged the Government's PVT methodology and supplied an expert critique from Dr. Elisabeth Sherman (co-author of the Sherman, Slick, & Iverson criteria and their 2020 revision), identifying two central flaws: (1) the Government's expert called two "failures" using a 25% cutoff, instead of the 10% false-positive rate convention used to avoid overcalling non-

13

credible effort; and (2) the Government's invalidity conclusion relied exclusively on five embedded ACS indices while ignoring the remainder of administered PVTs that Dr. Talbot passed. (ROA.1170–71 (quoting and summarizing Dr. Sherman's critique)). As Dr. Sherman explained, applying the proper 10% false-positive criterion across nine PVTs "yields no PVT failures out of 9 PVTs administered, a failure rate that does not meet the invalid performance criteria (B1b) for malingering." (ROA.1170-71).

The defense also alerted the court that the Government's original court-appointed neuropsychologist had misdescribed the testing corpus, averring that Dr. Michael Chafetz administered 13 tests, all of which Dr. Talbot passed—a result that likewise does not satisfy the Slick/Sherman/Iverson threshold for malingering. (ROA.1170). Those are not marginal quibbles. Under Rule 702, the court had to test whether the proffered "malingering" opinion rested on reliable methods and application before crediting it as a basis to deny further competency process. *Daubert*, 509 U.S. at 592–94; *Kumho Tire*, 526 U.S. at 149–50.

The need for gatekeeping is underscored by the trial transcript: on cross-examination, the Government's neuropsychologist (Dr. Robert Denney) conceded that Dr. Sherman's letter "is a criticism letter," and that "some of the things [Dr. Chafetz] did were not a customary way of doing things," while nevertheless asserting it was "acceptable." (ROA.2092). That exchange confirmed the existence

14

of a live methodological dispute about PVT cutoffs and selection—precisely the kind of dispute that *Daubert* requires a court to resolve on the record before relying on the opinion to adjudicate competence.

**B. The July 9, 2024 Order Reframed the Defense's Methodological Challenge as "No New Worsening" Leaving the Rule 702/*Daubert* Problem Unaddressed.**

The defense moved the day before trial for a competency hearing, attaching a new clinical evaluation (Dr. Chakrapani Ranganathan) and, crucially, pressing the methodological defects in the Government's malingering theory. (ROA.1165–66, 1167–71). The court denied a hearing, emphasizing that Dr. Ranganathan evaluated via telehealth, performed no new testing, did not review Drs. Curtis Schreiber and Robert Denney's recent materials, and described no "discernible worsening" since November 2023. (ROA.1189–90). But the order never engaged the actual *Daubert* objection: that the Government's earlier malingering conclusions were derived from unreliable cutoffs and selective tallying that, if corrected, eliminated PVT "failures" altogether under the field's own criteria. (ROA.1170-71).

"Reasonable cause" under § 4241 is a low threshold, especially when reliable clinical findings—VA disability and state interdiction/guardianship—already exist. *See United States v. Sterling*, 99 F.4th 783, 803 (5th Cir. 2024) (district court must act when evidence raises a nonfrivolous concern about present competence). Instead of analyzing the reliability of the Government's PVT approach under Rule 702, the

court treated the matter as a reconsideration request and declined to "rehash" competency in the absence of proof of deterioration. (ROA.1189-90). That is an error of law: *Daubert* reliability is not a "worsening" question; it is a threshold admissibility question the court must decide before relying on an expert opinion to uphold a competency determination. *Kumho Tire*, 526 U.S. at 149–50.

C. **The Court Also Discounted Powerful, Objective Counter-Evidence, Heightening the Need for Reliable Methodology.**

The defense presented extensive, objective markers of cognitive disease: magnetic resonance imaging ("MRI") evidence of frontal-lobe microvascular changes; multiple neuropsychological assessments showing deficits; VA adjudication of a 100% service-connected disability for major neurocognitive disorder and traumatic brain injury ("TBI"); and state interdiction/guardianship. (ROA.1167-69). The court did not question the authenticity of those determinations; it discounted them as either temporally earlier than November 2023 or not indicative of "worsening." (ROA.1189-90). But the right frame is *present* competence and the reliability of the opposing "malingering" inference given objective adjudications of incapacity by both VA and state court. When a defendant is interdicted under state law and adjudicated 100% service-connected disabled for major neurocognitive disorder, *Daubert* demands confidence that any contrary "malingering" opinion rests on discipline-respecting methods—not on inflated cutoffs and cherry-picked PVTs. *See Drope*, 420 U.S. at 180–81.

16

**D. <u>Expert-Selection Irregularities Amplified the Need for Strict Gatekeeping.</u>**

The reliability concerns were exacerbated by an expert-conflict episode: on November 6, 2023, the defense moved to disqualify Dr. Diana Goldstein after learning the Government intended to call her despite her prior retention as a defense consulting neuropsychologist in the same competency matter, with access to privileged defense communications and no timely expert report. (ROA.463-67). The motion cited *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996), and other "switching sides" cases, underscoring why any Government neuropsychology testimony admitted in this posture demanded scrupulous Rule 702 scrutiny. (ROA.465-67). Although that conflict issue is distinct from methodology, it reinforced the need for the court to resolve the PVT cutoff/selection dispute under *Daubert* before crediting any malingering opinion.

**E. <u>Prejudice and Remedy.</u>**

Two kinds of prejudice followed. First, the court's competency rulings—and refusal to revisit them—rest on unreliable expert methodology never vetted under Rule 702. *See Kumho Tire*, 526 U.S. at 152. Second, the same "malingering" label permeated trial management, including credibility assessments of defense witnesses who described functional limitations and the court's willingness to consider accommodations or pauses. In a case whose merits turned on fine-grained assessments of medical intent and judgment, a defendant's impaired ability to

17

consult with counsel is not academic; it is outcome-determinative. *See* 18 U.S.C. § 4241; *Dusky*, 362 U.S. at 402.

This Court should vacate the competency determination and remand with instructions to: (1) conduct a *Daubert*/Rule 702 hearing on the Government's malingering methodology, expressly addressing PVT cutoffs and selection under the Slick/Sherman/Iverson criteria; (2) exclude or strike any malingering opinion that relies on a 25% cutoff or ignores the full PVT battery and accepted invalid-performance criteria; and (3) hold a § 4241 hearing on present competence with admissible expert evidence only. If Dr. Talbot was not competent when tried, the convictions must be vacated. *Pate v. Robinson*, 383 U.S. 375, 385–86 (1966).

## II. THE DISTRICT COURT ERRED IN DENYING A COMPETENCY HEARING AND PROCEEDING WITHOUT ADEQUATE PROCEDURAL SAFEGUARDS UNDER 18 U.S.C. § 4241 AND DUE PROCESS.

Once competency is fairly in doubt, due process and § 4241 require the court to hold a hearing at which the Government bears the burden to prove competency by a preponderance. *United States v. Makris*, 535 F.2d 899, 906–08 (5th Cir. 1976). The touchstone is *Dusky*'s presentability standard: whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and a rational as well as factual understanding of the proceedings." *Dusky*, 362 U.S. at 402. The obligation to safeguard competence is continuing; courts must remain alert to developments that create "reasonable cause"

18

to doubt competence and must order appropriate examination and a hearing. *Drope*, 420 U.S. at 177–81; 18 U.S.C. § 4241(a)–(b).

By July 2024, the record showed far more than "reasonable cause." Dr. Talbot is a service-connected, 100% disabled veteran based on major neurocognitive disorder (dementia) and traumatic brain injury after comprehensive VA evaluation. (ROA.1167-68). Multiple clinical data points—2016 MRI findings of frontal lobe microvascular changes; neuropsychological documentation of poor memory, slowed processing and fine motor speed; and Cognistat results consistent with dementia— converged with treating neurologists' assessment of progressive decline. (ROA.1167–68). In parallel, Louisiana courts interdicted Dr. Talbot and appointed a curator in August 2021, an objective adjudication of impaired capacity by two judges. (ROA.1168).

Yet, the court denied the July 9, 2024 request, framing the question as whether the submission offered "new information" beyond the November 2023 hearing and emphasizing that "the Government, and this Court, continue to wonder why Defendant has not undergone an Amyloid PET scan." (ROA.1191). That analysis misapprehends § 4241. The statute is forward-looking ("may presently be suffering") and does not require a defendant to procure a specific medical test before the court orders an examination and convenes a hearing. 18 U.S.C. § 4241(a)–(b). The proper question was whether the then current picture—including the VA's

19

disability determination, the state interdictions, and longitudinal clinical evidence—created "reasonable cause" to reassess competence with the Government bearing the burden at a hearing. *Makris*, 535 F.2d at 906–08.

The court also discounted the VA disability adjudication as "relat[ing] back to a disability finding in October 2022" and therefore not shedding "new light" on current condition. (ROA.1191). But dementia is progressive—the court recognized as much elsewhere—so a prior VA determination of total disability for major neurocognitive disorder/TBI reinforces, rather than undermines, reasonable cause to reexamine close in time to trial. *See Drope*, 420 U.S. at 181 (duty is "continuing"). And § 4241 expressly gives the court tools to order an examination if needed; it does not permit shifting the threshold burden onto the defense to produce an additional test before a hearing is held. 18 U.S.C. § 4241(b)–(c).

Compounding the error, the court relied on its own courtroom observations to remain "comfortable" with competency: "The Court … has interacted with Talbot during numerous status conferences…. He spoke lucidly and appropriately…. While he was slow to answer some questions … he answered them appropriately." (ROA.1189-90). A trial judge's impressions may be relevant, but they cannot substitute for the statutory process where the record already presents bona fide doubt. *Drope*, 420 U.S. at 177–78. Nor can the absence of "sufficient evidence" of incompetence at a status setting justify skipping the hearing that § 4241 mandates

20

once reasonable cause is shown; if anything, that indeterminacy is why the statute requires a hearing and, if appropriate, a court ordered evaluation, with the Government then carrying the burden. *See Pate*, 383 U.S. at 385–86; *Makris*, 535 F.2d at 906–08.

Finally, the court's July 2024 order denying Dr. Talbot's Motion for Competency Hearing conflated the § 4241 threshold with the separate (and later) merits determination, emphasizing "no discernible worsening" since November 2023 and criticizing Dr. Ranganathan's telehealth evaluation. (ROA.1190-91). But a defendant need not show worsening to trigger a hearing; the statute asks whether there is reasonable cause that the defendant "may presently" be incompetent. 18 U.S.C. § 4241(a) (emphasis added). The VA's 100% disability determination for major neurocognitive disorder/ TBI, the state interdictions, and consistent clinical evidence satisfy that standard—without more. (ROA.1167–68, 1174–76). In short, the court's refusal to convene a hearing and to order any necessary testing inverted § 4241's framework and relieved the Government of its burden.

The competency ruling should be vacated and the case remanded with instructions to (1) conduct a § 4241 hearing, ordering any appropriate examination, and (2) require the Government to prove competence by a preponderance. *Dusky*, 362 U.S. at 402; *Pate*, 383 U.S. at 385–86; *Makris*, 535 F.2d at 906–08.

**III.    THE COURT ABUSED ITS DISCRETION BY ADMITTING VA "404(B)" EVIDENCE AND THEN RESTRICTING THE DEFENSE'S**

**ABILITY TO REBUT IT—INVITING PROPENSITY REASONING WHILE DEPRIVING THE JURY OF CONTEXT AND CONFRONTATION.**

Rule 404(b) permits "other act" evidence only for a proper noncharacter purpose, and only if its probative value is not substantially outweighed by unfair prejudice. *United States v. Beechum*, 582 F.2d 898, 911–15 (5th Cir. 1978) (en banc). The court denied the defense motion to exclude VA evidence, finding it relevant to knowledge and absence of mistake and promising a limiting instruction. (ROA.1146-49). But at trial the Government used the VA thread to imply guilt by character—precisely what Rule 404(b)(1) forbids—and the court curtailed cross examination needed to expose why the VA episode was a non-disciplinary administrative review, not wrongdoing.

Before calling its VA witness, the court delivered an other acts limiting instruction telling the jury it could consider extrinsic acts for "very limited, purposes"—such as state of mind, intent, or absence of mistake—and not for propensity. (ROA.4680-82). The final charge repeated that VA related other acts could not be used to prove character. (ROA.1259–60).

Despite those guardrails, the Government constructed a propensity tilted narrative. Special Agent Reyes walked the jury through a synthesized calendar/correlate—"compiled using time cards from the VA," PDMP data, and VPN logs—to suggest Dr. Talbot was prescribing at Medex while "working" at the

22

VA, inviting character inferences unmoored from any specific Controlled Substance Act ("CSA") element. (ROA.3686-89). Leaning on VA pay details and administrative footprints added color but not legitimate probative force as to whether specific Medex prescriptions lacked a legitimate medical purpose.

On cross examination of VA witness McDermott, the defense elicited the VA's contemporaneous "factfinding" conclusions: "There is no evidence of records fraud. All records contained documentation that will support an encounter," and "91% of the documentation for these encounters is located within the encounter note section or within the medication orders note section." (ROA.3162-64). That administrative review also reflected that only "(9%) 7 instances" did not meet a 90-day exam expectation. (ROA.900). In short, the VA paper the Government needed to convert into a "bad act" largely corroborated routine practice, not fraud.

After the Government opened the VA door, the defense attempted to examine the VA witness about the process and the role of VA leadership (Dr. Rivera) to show the VA exercise was non-disciplinary "advocacy," not proof of misconduct. The court cut off the inquiry at sidebar, limiting impeachment to "two sentences" of an audio clip and stating, "I'm not going to allow it … we're not going to dive into this." (ROA.3151-3153). That limitation prevented the jury from learning why the VA result was "unsubstantiated" as to fraud and from assessing the institutional context/bias of the paper the Government relied on. Such restrictions on otherwise

permissible credibility/bias inquiry offend the Confrontation Clause. *Delaware v. Van Arsdall*, 475 U.S. 673, 679–80 (1986). Under *Beechum*, the VA evidence fails both prongs as used here.

VA administrative review focused on internal paperwork and 12-week scheduling expectations does not tend to prove whether clinic prescriptions at a different practice, under different rules, were knowingly outside the usual course of professional practice. *See Ruan v. United States*, 597 U.S. 450, 469–71 (2022) (Government must prove the physician knew or intended prescriptions were unauthorized). The Government's overlay—time cards/PDMP/VPN—did not identify which Medex prescriptions were allegedly unlawful or authored by whom; it invited "once noncompliant, always noncompliant" reasoning.

The court's order expressly recognized the risk and promised a limiting instruction. (ROA.1148–49). But a boilerplate instruction cannot cure misuse where (as the transcript shows) the Government's narrative leaned on administrative VA materials to suggest general bad character and to juxtapose "VA work" against clinic prescribing. *See United States v. Kinchen*, 729 F.3d 466, 473–75 (5th Cir. 2013) (reversing where "other acts" use risked propensity). The prejudice was magnified when the court curtailed cross about the VA process and authorship (Dr. Rivera), leaving the Government's curated account intact. (ROA.3167-68).

Pretrial, the court conditionally granted the defense motion and ordered the Government to approach before any mention of a patient death. (ROA.891-92). Even guarded, that mortality thread was an inherently inflammatory sidebar with minimal probative value, risking punishment for uncharged consequences—exactly the kind of unfair prejudice Rule 403 seeks to avoid. *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

The court later read the VA proof as properly admitted to show knowledge/intent and deemed limiting instructions sufficient. (ROA.1148-49; ROA.1473-99). When the Government's actual use is to urge inference by character, however, the prejudice is not collateral—it's the point, and *Beechum*'s second prong is not met. *See Beechum*, 582 F.2d at 915.

Because the VA strand was used as propensity proof, and because the court restricted cross examination necessary to rebut that inference, the admission was an abuse of discretion and the restrictions violated the Sixth Amendment. *See Van Arsdall*, 475 U.S. at 684. A new trial is required.

## IV.    THE EVIDENCE IS INSUFFICIENT TO SUSTAIN DR. TALBOT'S CONVICTIONS.

The government's case rested on inferential leaps from office routines, calendar overlays, and an expert's disagreement with clinical judgment—not on proof that Dr. Talbot *knew* his prescribing was unauthorized under § 841 *as Ruan* requires. *See Ruan v. United States*, 142 S. Ct. 2370, 2376–79 (2022) (the

government must prove the practitioner knew or intended that the prescriptions were unauthorized). The court's order leaned on generalized descriptions of clinic flow and the testimony of Dr. Tricia Aultman (and on Dr. Prasad's account) to conclude prescriptions were issued "outside the usual course" and at times "without a legitimate medical purpose," but that resolves the wrong question: after *Ruan*, the government had to carry the burden on Dr. Talbot's *subjective* knowledge or intent. (ROA.1479–80).

The government's Rule 29 opposition underscores the gap. It catalogues patient anecdotes and staff vignettes, then asserts—via Dr. Aultman—that "many (if not all)" prescriptions lacked a medical basis. (ROA.1427-29). But expert after the fact disagreement does not prove that *Dr. Talbot knew* the prescriptions were unauthorized. *Ruan*, 142 S. Ct. at 2377–79. Nor do insurer prior authorization forms or staff assistance with paperwork supply *mens rea* criminalize medical decisions. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (sufficiency asks whether *any* rational factfinder could find each element beyond a reasonable doubt). The order's sufficiency analysis, which repeatedly returns to Dr. Aultman's conclusions and Dr. Prasad's testimony about workflow, substitutes an objective malpractice like yardstick for the subjective standard *Ruan* commands. (ROA.1479-80).

The government's Count 6 theory suffers a similar defect. Section 856 punishes "maintain[ing] any place for the purpose of" distribution or use; it requires proof that illicit distribution was a *significant purpose* of the premises, not merely a byproduct of legitimate pain/addiction practice. *United States v. Soto-Silva*, 129 F.3d 340, 346 (5th Cir. 1997); *United States v. Morgan*, 117 F.3d 849, 856 (5th Cir. 1997). The government and the order relied on the fact that "a majority" of Medex patients received controlled substances and on prior authorization paperwork to infer illicit "purpose." (ROA.1429-32). But volume and paperwork in a specialty pain/addiction clinic are not proxies for § 856's purpose element. *See Soto-Silva*, 129 F.3d at 346 (premises must be *maintained for* illicit purpose).

The health care fraud conspiracy (Count 7) likewise lacks proof of agreement and financial motive. The defense explained (without contradiction) that Dr. Talbot collected cash for office visits and did not share in pharmacy reimbursements—facts that weaken any inference he intended to join a scheme to submit false claims. (ROA.1322-24). The Government's response cites prior authorization and chart audit disputes but never connects those administrative artifacts to an agreement by Dr. Talbot to defraud insurers. (ROA.1439–41). Conspiracy cannot be proven by association with a busy clinic; it requires evidence of a shared unlawful objective. *United States v. Delgado*, 672 F.3d 320, 331–32 (5th Cir. 2012) (en banc).

To the extent the government invokes *United States v. Lamartiniere*, 100 F.4th 625, 638 (5th Cir. 2024), to argue the "authorization" prongs are disjunctive (no legitimate purpose *or* outside the usual course), the indictment's conjunctive phrasing still informs notice and unanimity, and *Ruan's subjective knowledge* requirement governs either way. (ROA.1319-20). On this record, no rational juror could find beyond a reasonable doubt that Dr. Talbot (1) *knew* his prescribing was unauthorized (Counts 1–5), (2) maintained Medex *for the purpose* of illicit distribution (Count 6), or (3) agreed to defraud insurers (Count 7). *Jackson*, 443 U.S. at 319.

## V.    THE COURT IMPROPERLY INSTRUCTED THE JURY

The § 841 instructions did not comport with *Ruan* and, paired with related charging language, require reversal. In *Ruan*, the Court held that "the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." 142 S. Ct. at 2376–79. The written instructions here framed "usual course of professional practice" in *objective* terms—"a standard of medical practice generally recognized and accepted within the United States"—and then added an affirmative directive that "knowingly or intentionally issuing a prescription outside the course of professional practice is a sufficient condition to convict," and likewise for "without a legitimate

medical purpose." (ROA.1264-66). The court read that language essentially verbatim. *See id*.

Those formulations misaligned the *mens rea* in two ways. First, by anchoring "usual course" to what is "generally recognized and accepted," the charge allowed conviction if the jury found Dr. Talbot's prescribing *objectively* deviated from national norms—even absent proof he *knew* it was unauthorized. (ROA.1264-65). That is the pre-*Ruan* frame *Ruan* rejects. 142 S. Ct. at 2376–79. Second, telling jurors that either prong ("outside the course" or "without a legitimate purpose") is a "sufficient condition to convict" so long as the act of issuing was "knowingly or intentionally" performed divorces scienter from *authorization*, permitting conviction if Dr. Talbot intentionally wrote prescriptions that the jury later deemed *objectively* outside the usual course. (ROA.1265-66). That contradicts *Ruan's* command that knowledge or intent must attach to *the unauthorized status* of the prescriptions. 142 S. Ct. at 2376–79.

The court elsewhere listed an element stating the Government had to prove "the defendant knew he was acting in an unauthorized manner," (ROA.1266), but that correct statement cannot cure the earlier, affirmative "sufficient condition" directive that authorized conviction upon an objective deviation coupled with an intentional act of prescribing. *See Neder v. United States*, 527 U.S. 1, 15 (1999)

29

(*mens rea* misinstructions require reversal unless harmless beyond a reasonable doubt); *Chapman v. California*, 386 U.S. 18, 24 (1967).

The risk of misapplication was heightened by companion instructions that invited jurors to fold civil standards into the criminal "authorization" inquiry. The charge told jurors they could consider "rules and regulations, ethical standards, and standards of care" in deciding whether a defendant acted "without authorization." (ROA.1271). And in defining "false" for the health care fraud count, the court equated falsity with statements made "with reckless indifference to [their] truth or falsity." (ROA.1269-70). That definitional spillage risks importing a negligence/recklessness lens into § 841's *knowledge/intent* requirement—precisely what *Ruan* forbids.

At the charge conference, defense counsel objected on the record, specifically requesting a third § 841 element—"that the defendant knew he was acting in an unauthorized manner"—and objecting to the instruction's statement that either "outside the usual course" or "without a legitimate medical purpose" would be "sufficient" to convict, warning that *Ruan requires* knowledge of *unauthorized* status. (ROA.4536-37). Counsel also objected to defining "usual course" by a "generally recognized and accepted" national standard as importing an objective civil yardstick into a criminal intent inquiry. *Id.* These objections "distinctly" stated

30

both matter and grounds, preserving the issue for *de novo* review. *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc).

The error was not harmless. This case did not include an admission that Dr. Talbot knew his prescribing was unauthorized; the Government's proof relied on office workflow, prior authorization paperwork, and expert second guessing—exactly the sort of material most likely to be filtered through an objective "standards of care" lens. *See*, *e.g.,* the charge's invitation to consider "rules and regulations, ethical standards, and standards of care" when deciding "authorization." (ROA.1271). And because the court applied the same § 841 definitions to the substantive counts as to Count 1, the defect infected all § 841 counts. (ROA.1266-67). On this record, the government cannot show beyond a reasonable doubt that the jury convicted under the correct *Ruan* standard rather than the instruction's objective "sufficient condition" path. *Neder*, 527 U.S. at 15; *Chapman*, 386 U.S. at 24.

The government's anticipated rejoinder—that the elements paragraph recited "knew he was acting in an unauthorized manner"—ignores the internal inconsistency created by the "sufficient condition" sentences, which affirmatively *told* jurors that either prong was enough so long as the act of prescribing was intentional. (ROA.1265-66). When a charge contains both a correct element and an incorrect "sufficient condition," the risk of juror confusion is

31

intolerable where the element is *mens rea*. *Neder*, 527 U.S. at 15. Reversal is required.

**VI.** **MAINTAINING A DRUG INVOLVED PREMISES (§ 856) MUST BE VACATED BECAUSE THE STATUTORY TEXT DOES NOT REACH A PHYSICIAN'S PRESCRIBING ("DISPENSING") AND, IN ANY EVENT, THE GOVERNMENT FAILED TO PROVE THE REQUIRED "PURPOSE."**

Count 6 alleged that, from about February 2015 through July 2018, Dr. Talbot "knowingly, intentionally, and unlawfully" used or maintained Medex "for the purpose of distributing Schedule II–IV controlled substances outside the usual course of professional practice and without a legitimate medical purpose." (ROA.50) Before trial, the defense moved to dismiss Count 6 on the ground that the conduct at issue—writing prescriptions in a medical clinic—falls outside § 856(a)(1), which criminalizes maintaining a place "for the purpose of manufacturing, distributing, or using any controlled substance," and says nothing about "dispensing." *See* 21 U.S.C. § 856(a)(1).

That omission is dispositive. The CSA defines "dispense" to mean delivery "to an ultimate user … by, or pursuant to, the lawful order of, a practitioner, including the prescribing and administering of a controlled substance," 21 U.S.C. § 802(10), whereas "distribute" means delivery "other than by administering or dispensing," *id.* § 802(11) (emphasis added). Congress thus treated "distribute" and "dispense" as mutually exclusive. When Congress wanted to reach practitioners'

32

prescribing, it said so expressly—as in § 841(a)(1), which proscribes "manufactur[ing], distribut[ing], or dispens[ing]" controlled substances "except as authorized." 21 U.S.C. § 841(a)(1). Section 856, by contrast, omits "dispense." Giving effect to that deliberate choice is "a cardinal principle of statutory construction." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 133 (5th Cir. 2018).

The government's charging theory tried to sidestep the text by pleading Count 6 in § 841's vocabulary—claiming Medex existed to "distribute … outside the usual course of professional practice and without a legitimate medical purpose." But those are § 841 "authorization" qualifiers, not § 856 terms. Relabeling medical prescribing (i.e., "dispensing") as "distributing" cannot rewrite § 856. *See* 21 U.S.C. §§ 802(10)–(11).

The defense flagged precisely this mismatch below, and the court heard the motion at the June 21, 2024, setting and took it under advisement. (ROA.890). The court later instructed the jury that Count 6 required proof that Dr. Talbot "used or maintained a place for the purpose of distributing a controlled substance in an unauthorized manner," borrowing § 841's "unauthorized" construct to define § 856's "purpose." (ROA.1264-66). *See* definitions of "distribute" ("other than … dispensing") and "dispense" ("including … prescribing") in the same charge.) This confirms the problem: the jury was told to decide a § 856 "premises" offense using

33

§ 841 medical authorization concepts even though § 856's operative verbs do not reach "dispensing."

If any ambiguity remained (there is none), the rule of lenity would require resolving it in Dr. Talbot's favor. *See United States v. Granderson*, 511 U.S. 39, 54 (1994).

Citing *United States v. Barnes*, 803 F.3d 209, 216 (5th Cir. 2015), the Government argued that Count 6 is satisfied if Dr. Talbot owned/controlled Medex and drug activity was "a significant reason" for using the premises. (ROA.1427-29). But *Barnes* addresses how to decide whether a defendant "maintained" a place (ownership/leasehold, supervisory control, etc.), not whether the place was maintained "for the purpose of manufacturing, distributing, or using" controlled substances. 803 F.3d at 216. Even crediting ownership and supervisory control, § 856 still requires proof of the *enumerated* purpose—and, as shown above, the statute's enumerated "distribute" purpose does not subsume a physician's prescribing (dispensing). The district court's posttrial order nonetheless leaned on ownership/control and on "processes" that allowed continuity of care while Dr. Talbot worked VA hours, treating those facts as sufficient to show a § 856 purpose. (ROA.1473-98). That conflates "maintain" with "purpose."

*Ruan v. United States* holds that a practitioner may be convicted under § 841 only if the government proves beyond a reasonable doubt that the prescriber *knew*

34

*or intended* that the prescribing was unauthorized. 597 U.S. at 468–69. Allowing § 856 to reach physician "dispensing" would enable an end-run around *Ruan*: the government could prove a premises offense by recasting contested medical judgments as a "distribution" purpose untethered to § 841's subjective *mens rea*. That is not how Congress wrote the CSA. *See also United States v. Tobin*, 676 F.3d 1264, 1275 (11th Cir. 2012) (recognizing the CSA's structure respects the states' primacy in regulating medical practice while subjecting practitioners to § 841's *authorization* limits).

Assume arguendo that § 856 could apply to a clinic where prescriptions are written. The Government still had to prove beyond a reasonable doubt that Medex was used or maintained *for the purpose of* distributing controlled substances in an unauthorized manner, not merely that controlled substance therapy occurred there. *Barnes* distinguishes "maintain" from "purpose," 803 F.3d at 216, and the Fifth Circuit has repeatedly rejected "volume alone" as a proxy for the required purpose. Yet the Government's presentation relied on clinic workflow and prescription counts (often filtered through § 841's authorization lens) to infer a § 856 purpose. (ROA.1427-29) (urging "significant purpose" on ownership/operations proof). The district court's order likewise cited ownership/control and "processes … to continue prescriptions when Dr. Talbot was at the VA," but those facts show a functioning medical practice—not a § 856 "distribution" site. (ROA.1473-98). Because

35

§ 856(a)(1), properly construed, does not apply to a physician's prescribing at a bona fide medical clinic, Count 6 "fails to set forth an offense" and should have been dismissed as a matter of law. *See* Fed. R. Crim. P. 12(b); cf. *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) (pretrial dismissal appropriate where, as a matter of law, alleged facts do not constitute an offense). At a minimum, the evidence did not permit a rational juror to find that Medex was maintained *for the purpose of distributing* drugs within § 856's meaning, as opposed to being a medical office where prescribing ("dispensing") occurred subject to § 841 *and Ruan's mens rea*. The conviction on Count 6 should therefore be vacated and the count dismissed.

## VII.　THE PROSECUTION'S REBUTTAL CONTAINED IMPROPER, PREJUDICIAL REMARKS—INCLUDING A PATIENT DEATH INSINUATION—REQUIRING VACATUR.

A conviction cannot stand when "improper suggestions, insinuations, and especially assertions of personal knowledge" in summation risk unfair prejudice. *Berger v. United States*, 295 U.S. 78, 88 (1935). The Fifth Circuit asks: (1) were the remarks improper; and, if so, (2) did they affect substantial rights in light of the magnitude of prejudice, curative efficacy, and the strength of the evidence? *United States v. Gracia*, 522 F.3d 597, 600–01 (5th Cir. 2008); *United States v. Gallardo-Trapero*, 185 F.3d 307, 320–23 (5th Cir. 1999). The "invited response" doctrine "is not a license to make otherwise improper arguments." *United States v. Young*, 470 U.S. 1, 12–13 (1985).

36

**A. Patient death insinuation in rebuttal violated the court's limit and inflamed the jury.**

Pretrial, the court conditionally granted the defense's motion to exclude references to a patient death and ordered the Government to approach before any such mention. (ROA.891-92). Nonetheless, in summation and rebuttal the prosecutor suggested that if Dr. Talbot had provided "appropriate medical care," a patient (T.N.) would not have died of pulmonary fibrosis—years after Dr. Talbot last treated her and despite no "death resulting" charge. Defense objected at sidebar; the court told jurors the government was *not* indicating Dr. Talbot caused T.N.'s death. (ROA.4660-61) Defense immediately requested further clarification that T.N. was under a pulmonologist's care during Dr. Talbot's treatment; the court declined. (ROA.1397-99).

Injecting mortality at the end of trial—contrary to the court's pretrial limit—was highly prejudicial and untethered to any element of the nondeath § 841 counts. *See id*.; *see also* (ROA.735-37) (collecting authority that death evidence is unduly prejudicial absent a *Burrage* charge). The off-the-cuff curative aside could not unring that bell at rebuttal's crescendo. *Gracia*, 522 F.3d at 604 (final argument's timing magnifies prejudice).

Rebuttal opened by asserting that "every point" defense counsel made "misstated the facts and the law" and that counsel was trying to "pretend away" the case—repeating the "pretend away" refrain as a cudgel. (ROA.4651-52, 4656-57).

That is not fair comment on evidence; it is an attack on counsel's character and integrity, which is "undoubtedly inappropriate." *United States v. Diaz-Carreon*, 915 F.2d 951, 958–59 (5th Cir. 1990). The defense promptly documented the issue post-trial. (ROA.1398-99).

After the jury retired, defense counsel made a record that rebuttal insinuated "many prescriptions were issued by Dr. Prasad under Practice Fusion … outside the time period that he would be there," even though no witness testified to shared logins or off hours charting and the defense's immediate informatics check showed 93% of Dr. Prasad account prescriptions were between 6:00 a.m. and 10:00 p.m., roughly two thirds before 4:00 p.m. Defense requested a curative instruction or mistrial. (ROA.4698-99). Injecting facts not in evidence during rebuttal is improper. *Gracia*, 522 F.3d at 603–04; *Young*, 470 U.S. at 13.

The court treated VA related material as Rule 404(b) "other acts," warning jurors not to use it for propensity. (ROA.1148-49). Yet rebuttal told jurors that Dr. Talbot's having "worked at Medex before the VA doesn't … clear him of the crimes he committed while he was at the VA," called VA timecard records "certified," and asserted that "those records … were false." (ROA.4651-52). That invited conviction by propensity—"crimes … at the VA" means guilt here—despite the VA's own factfinding that original fraud allegations were "not substantiated." (ROA.4651; ROA.3162; ROA.1454-55).

38

Only one prompt curative statement was given, limited to saying the government was not claiming Dr. Talbot *caused* T.N.'s death. (ROA.4660-61). No curative addressed the personal attacks on counsel, the extra-record Practice Fusion timing assertion, or the renewed VA propensity pitch. The absence (or insufficiency) of curatives weighs heavily toward prejudice. *Gracia*, 522 F.3d at 604. And this was not an overwhelming case under *Ruan's* subjective *mens rea* standard; the government leaned on workflow, scheduling, and documentation—exactly the sort of objective practice themes most susceptible to confusion when paired with inflammatory rebuttal. *See Ruan*, 597 U.S. at 468–69.

The death insinuation was preserved at sidebar (and further memorialized in ROA.1397–99). The extrarecord Practice Fusion timing claim was preserved immediately after rebuttal. (ROA.4698-4699). The personal attack comments, even if not objected to independently, warrant relief under plain error review given their severity and repetition. *See Diaz-Carreon*, 915 F.2d at 958–59; *Young*, 470 U.S. at 15. The cumulative effect—patient death insinuation (contrary to the pretrial limit), attacks on counsel, extrarecord "analytics," and VA propensity—requires a new trial. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (cumulative error). At a minimum, the affected convictions should be vacated and remanded. *See Gracia*, 522 F.3d at 604–05; *Gallardo-Trapero*, 185 F.3d at 322–23.

## CONCLUSION

For these reasons, Dr. Talbot respectfully asks that the Court reverse his convictions. Short of reversal, Dr. Talbot respectfully requests that the Court remand for a new trial.

Respectfully submitted,
CHAPMAN LAW GROUP

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.
MI Bar No. P73179
1441 West Long Lake Road, Suite 310
Troy, Michigan  48098
T: (248) 644-6326
F: (248) 644-6324
RWChapman@ChapmanLawGroup.com

*Counsel for Defendant – Appellant*
*Adrian Dexter Talbot, M.D.*

# CERTIFICATE OF SERVICE

I, Ronald W. Chapman, certify that on August 22, 2025, the foregoing document was served upon counsel of record using the Court's ECF system.

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II, Esq., LL.M.
*Counsel for Defendant – Appellant*
*Adrian Dexter Talbot, M.D.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 7,715 of words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft 365 MSO (Version 2404) in 14-point Times New Roman font.

<u>/s/ *Ronald W. Chapman II*</u>
Ronald W. Chapman II, Esq., LL.M.
*Counsel for Defendant – Appellant*
*Adrian Dexter Talbot, M.D.*